John R. GRUMBLING, Individually and as Personal Representative of the Estate of Freida Mae Grumbling, Deceased, Plaintiff,

v.

MEDALLION INSURANCE COMPANY, a Missouri Corporation, Defendant.

Civ. No. 74–485.

United States District Court, D. Oregon.

May 8, 1975.

Roger B. Todd, North Bend, Or., for plaintiff.

James G. Breathouwer, Portland, Or., for defendant.

## OPINION

BURNS, District Judge:

### NATURE OF THE CASE:

This is an excess judgment case with an unusual twist. May an insurer be held liable for the excess of a judgment over its policy limits when it fails to respond within a fifteen-day period specified in a lawyer's letter offering to settle for the policy limits, even though it offered to pay those limits on the eighteenth day after the letter was received? Under the peculiar circumstances of this case, it may, and, indeed, I conclude that a preponderance of the evidence requires that it must.

Plaintiff [1] was injured and his wife killed in a collision with a car driven by defendant's insured, Daniels. Plaintiff's attorney offered to settle for the policy limits. He expressly conditioned the offer by advising that if not accepted within 15 days, it would be withdrawn, and actions filed. On the 17th day of silence, plaintiff's attorney wrote a letter withdrawing his offer. Plaintiff refused to accept an offer of $20,000— the policy limit—tendered by the defendant insurer on the 18th day. Instead, plaintiff proceeded to trial on both the injury and the wrongful death actions, recovering judgments totaling $127,497.-25. Defendant paid only the $20,000 policy limit. Plaintiff brings this diversity action as Daniels' assignee to recover the excess of $107,497.25.

The parties agree that the governing Oregon law stems from Radcliffe v. Franklin National Insurance Company, 208 Or. 1, 298 P.2d 1002 (1956) and Groce v. Fidelity General Insurance Company, 252 Or. 296, 448 P.2d 554 (1968). This district has had occasion to apply the Oregon law governing correlative rights and duties between insur-

er and insured in Robertson v. Hartford Accident and Indemnity Co., 333 F.Supp. 739 (D.Or.1970). The upshot of these cases is that in Oregon, an insurance underwriter must exercise good faith and due care in the negotiations and settlement of claims in behalf of its insured. The insurer has a duty to exercise at least the same degree of care as to the insured's interest as it exercises as to its own.

Neither side cites any case even reasonably close in point. Nor has my own research disclosed such a case. Consequently, I must depend largely upon reason and analysis in deciding whether defendant violated its duty of due care to its insured and whether plaintiff's imposition of a fairly short time limit can be allowed to control the extent and nature of that duty.

### THE FACTS:

The accident between the Grumblings and Daniels occurred April 23, 1973. Plaintiff's injuries were severe. He was hospitalized for a substantial period of time. As mentioned, plaintiff's wife was killed. Daniels, who was drunk, was driving in the wrong direction on a four-lane highway. He was without assets other than his insurance policy with Medallion, providing $10,000 for one individual and a maximum of $20,000 per accident.

Defendant immediately commenced investigation of the accident by securing the services of an independent insurance adjuster in the Coos Bay area, where the accident occurred. The adjuster promptly reported all of the relevant circumstances to the defendant's Portland claims office. On April 26, the adjuster forwarded his first report, indicating that this was a "policy limits" case and that Daniels was clearly liable. In a letter dated May 29, the adjuster described his conversation with a local Coos Bay

---

1. Plaintiff brings this action not only on his own behalf but also as personal representative of the estate of his deceased wife. He is also, in both capacities, the assignee of Daniels' rights, as insured, against defendant Medallion as insurer.

attorney who had expressed the opinion that:

" . . . the death case and the personal injury claim are going to both have values in excess of our coverage irregardless of the outcome of the insured's criminal charge . . . we should protect ourselves to immediately settle within the policy limits if an offer is made at any time by the adverse party to settle within these limits. He felt there was a possibility if an offer was made to settle within the policy limits and we failed to do so and the offer became withdrawn that we might set ourselves up on a bad faith situation so the claimants would possibly be able to recover an excess judgment." [2]

Defendant's Portland claims manager, Dennis O'Leary, responded by telephone, demanding that this letter be destroyed, because it "contained information that had not been asked for." A replacement letter, deleting any reference to the attorney's opinion, was requested. Although the adjuster testified that O'Leary had, in fact, asked for this information, he complied with the request on June 7, 1973. O'Leary testified that although he believed that the adjuster's report and recommendation were valid, more information was required before payment of the full policy limit could be justified. However, he was unable to refer to any additional material information that had been requested and was outstanding or to any material information bearing upon the claim that was later received from the adjuster.

Neither defendant nor the adjuster were aware of plaintiff's representation by counsel until June 15, 1973, when Daniels [3] and the adjuster each received a demand letter (dated June 14) from plaintiff's attorney. The letter included an offer to settle both plaintiff's suit for personal injuries and the wrongful death action for his wife, for the maximum amount of Daniel's policy, or $250,000, whichever was the lesser amount. This offer, in terms, was for 15 days only. Although defendant did not receive notice of the offer directly, the adjuster promptly notified Mr. O'Leary by telephone of its existence and forwarded a copy of the letter. Both testified that the fifteen-day time limit was not mentioned during their conversation.

June 15th was Mr. O'Leary's final day as a Medallion employee. Unaware of the fifteen-day time limit, he did not mark plaintiff's file for special attention before leaving. As a result, the demand letter was not reviewed by anyone in authority at the Portland office until June 20 when an interim employee; Gerald Campbell, noticed the letter and its urgency. Campbell immediately forwarded a report to Medallion's home office in Kansas City, advising of plaintiff's representation by an attorney, and his settlement offer. He recommended a counter-offer of $17,500 and requested authority to settle the claim for the policy limit of $20,000. A copy of plaintiff's demand letter was included. Campbell's report was received and acted upon by Donald Scaiano, defendant's General Claims Superintendent in Kansas City.

---

2. Defendant had requested its local adjuster to visit with an experienced defense attorney for the purpose of deciding whether the company should retain counsel to assist the lawyer then representing Daniels on the criminal charges (negligent homicide) which grew out of the crash.

3. Daniels' attorney, Berg, wrote the adjuster on June 21, stating that "It appears . . . that Mr. Daniels is clearly liable" and that "I assume you . . . have recommended to them immediate settlement of this case so that action will not be filed by Mr. Grumbling." This letter was transmitted by Adjuster Brown to defendant's Portland office on June 28, 1973. On July 11, 1973, after the cases were filed, Berg, in writing directly to defendant's Portland office, stated that " . . . because of your delay and neglect in effecting a settlement within the limits of Mr. Daniels' policy, that in the event any judgment is obtained in excess of Mr. Daniels' limits, we will, of course, look to Medallion . . ."

He arranged for a meeting of Medallion's claims committee to obtain the necessary approval before a settlement offer could be authorized. Scaiano testified that this meeting was held as soon as possible because of the urgency created by plaintiff's demand letter. The meeting apparently took place on Wednesday, June 27, since his letter authorizing settlement by the Portland office was mailed on that date. It was his policy to make such notifications immediately following the committee's decision. Scaiano knew that defendant's acceptance was required by the following Monday, July 2. He also knew that it was questionable whether or not his authorization would reach Portland in time to permit effective action. Nonetheless, he decided against using the telephone, because it was his policy to make such authorizations in writing "to prevent misunderstandings." No attempt was made either in Portland or Kansas City to obtain an extension from plaintiff of the settlement period.

Scaiano's letter was received by the Portland office on Monday, July 2. It recommended a settlement of $17,500, but authorized payment of $20,000 if necessary. The new claims manager, Mr. John Strode, had begun his duties that day, but did not become aware of plaintiff's file until the following morning, July 3. At the same time he received a second letter from plaintiff's attorney advising him that since defendant had not responded to plaintiff's offer within the time limitations imposed by the earlier letter, it was assumed that Medallion "was not interested in discussing settlement of the claims." The letter also withdrew the previous settlement offer and notified the defendant that appropriate legal actions were being filed in state court. Recognizing the gravity of this situation, Strode telephoned plaintiff's attorney in Coos Bay, only to find that he was at that moment at the courthouse filing the actions referred to. Strode left word with the secretary that defendant was willing to extend its policy limits in order to settle these claims, and confirmed this fact by letter on July 5, 1973. Plaintiff rejected defendant's offer and proceeded to trial, where he recovered the judgments against Daniels which are the subject of this action.

Our task is to determine whether the factual situation outlined shows conduct which amounts to good faith, or due care, or not, and whether the insurer, in its actions, exercised at least the same degree of care with respect to the interest of the insured as it exercised with respect to its own interest.

In the first instance, even though Brown, the local adjuster, apparently did not notify O'Leary in Portland when he talked to him over the phone of the fifteen-day time limit, it is clear that when the mail arrived in Portland a copy of the letter containing this time limit was received by the Portland office. Hence, the Portland office of defendant was on notice of the existence of the time limit.

Secondly, it might be concluded that O'Leary's failure to act upon the matter that day (because it was his last day on the job) by promptly forwarding the message could not be held to be the cause of any damage. Nonetheless, when Campbell arrived the following week he noticed (on June 20) Todd's letter and, indeed, noticed its urgency. Yet Campbell did not use the phone but rather forwarded the matter by mail to the home office in Kansas City. As is frequently done, he requested authority to settle within the policy limits but recommended that initially a counteroffer of $17,500 be made.

Third, after the letter was received in Kansas City the general claims superintendent had sufficient time to react. Yet he did nothing other than invoke the usual claims review procedure. After securing approval from the claims committee to tender the full amount, he transmitted, on June 27, this grant of authority back to Portland by the usual method of the mail. Scaiano knew that according to the terms of the plaintiff's

proposal the final day for acceptance would be Monday, July 2. However, he did not bother to communicate with the Portland office (or directly with plaintiff's attorney) by telephone for an extension or for settlement discussion. On Monday, July 2, defendant-insurer had a new manager just getting used to his position. He didn't notice the file until the following day, at which time, of course, the time limit had expired. When he noticed the matter on July 3 he did a reasonable thing, namely, he picked up the telephone to call the office of plaintiff's lawyer. But it was too late. As a result, the offer of the full policy limits was rejected. As a consequence the cases went to trial and the excess judgments, which otherwise would have to be paid by the insured, were recovered.

Under these circumstances, the conduct of the insurer amounted to lack not only of good faith but also due care toward its insured. When the sole reason for failure to use speedy telephone communication is company procedure, namely, to make sure that instructions are transmitted in writing so as not to be misunderstood, this is the same as preferring insurer's interest above those of the insured. Since this conduct occurred in the summer of 1973 (approximately 97 years after Bell invented the telephone), it is difficult to see how it can be called reasonable conduct or good faith or due diligence as required by the contract of insurance.

Nothing in this decision is intended to lay down a rule of law that would mean that a plaintiff's attorney under similar circumstances could "set up" an insurer for an excess judgment merely by offering to settle within the policy limits and by imposing an *unreasonably* short time within which the offer would remain open. Obviously, also, if such an offer expired before the insurer's investigation was sufficiently incomplete so as to prevent adequate evaluation of the severity of the claim (and, therefore, of the danger of an excess judgment to the insured), this would not necessarily allow the plaintiff to prevail. But it is common at various stages of litigation, and, indeed, occasionally even before litigation is commenced, for offers to be made with time limits attached. Sometimes in the middle of the trial of a lawsuit an offer will be made with a very short time limit which requires virtually immediate response. The sequence of events, the stage of the proceedings at which the offer is made, and all the other circumstances will determine whether duty requires a response to be made within a given time limit. Defendant knew long before the receipt of the settlement proposal that this was a sure liability case, and that damages would far exceed the policy limit. Indeed, even though the surviving plaintiff was still in the hospital (when the offer was made and when it expired) and his condition not yet stable, all this would mean would be that the passage in time would increase, not decrease, the quantum of damages to be expected.

This opinion shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 52 F.R.Civ.P.